

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-17-00066-CR

LARRY WEBB, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th District Court
Bowie County, Texas
Trial Court No. 15-F-0870-005

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley

O P I N I O N

Larry Webb was convicted in Bowie County, Texas, of aggravated sexual assault of a child (his step-granddaughter) and indecency with the same child by sexual contact,[1] receiving a life sentence.[2]

On appeal, Webb raises three points of error, contending: (1) that the trial court erred in allowing a witness to testify that the victim was telling the truth when reporting the incident, (2) that error was committed when the statements given by Webb to the police were allowed into evidence, and (3) that the evidence was legally insufficient to support the trial court's assessment of $534.00 in court costs against him.

We affirm the trial court's judgment because: (1) the neighbor testified concerning whether the victim was upset rather than the veracity of the victim's statements; (2) if any error was committed in permitting the introduction of Webb's statements to the police, Webb waived any such error as a point for appeal; and (3) the record is sufficient to support the assessed court costs.

## I. Factual and Procedural Background

Because the victim (fourteen-year-old Susan[3]) had known Webb her entire life as her step-grandfather, whom she called "Pop," she and her sister enjoyed spending time with him. Because of their close relationship, they would sometimes spend the night with him at his house. After

---

[1]The jury acquitted Webb of a second count of aggravated sexual assault of a child and a second count of indecency with a child by sexual contact.

[2]Webb pled true to an enhancement paragraph alleging a prior felony conviction for sexual abuse.

[3]In order to protect the child's identity, in this opinion we refer to her as Susan and her mother as Melissa. *See* TEX. R. APP. P. 9.8.

making arrangements with Susan's mother, Melissa, Susan spent the night of September 19, 2015, at Webb's house. Even though Susan's sister did not go, Susan, who had just turned fourteen years' old, "wanted to still go to spend time with her grandfather for her birthday."

Melissa testified that Susan called her that evening from Webb's house and asked if she could take some Tylenol, and Melissa told her she could. Susan testified that she told Webb that she was not feeling well. Because the bed she usually slept in was dirty and cluttered with things, Webb told her to lie down in his bed, an instruction she followed. Susan went on to relate that Webb entered the bedroom naked and got into the bed with her. She claimed that Webb touched and squeezed her breasts, put his hand inside her panties, inserted his finger in her vagina, and made her touch his penis with her hand. Webb removed her pants and "stuck his penis in [her]" vagina, causing her pain. She testified that even though his actions caused her to cry and she yelled at him to cease, he did not stop until later. After Webb stopped, he exited the bedroom and went into the living room, where he fell asleep. Susan then grabbed the house wireless telephone,[4] called her mother, and ran outside.

Melissa testified that about an hour after the first telephone call, Susan called her again, from Webb's bedroom telephone, only this time she was "hysterical" and crying. She told Melissa that Webb had raped her. Susan ran out of the house and hid under a boat that was in Webb's yard. While she was under the boat, Webb came outside looking for her, and he said, "[Susan], where are you? I'm going to kill you and whoever you tell." Melissa told her, "Run, get as fast as you can to a neighbor's house." At some point, the call disconnected. Melissa dialed 9-1-1.

---

[4]Apparently, the telephone was a cordless home phone rather than a cell phone.

Susan ran to the house next door, the home of Jennifer McDonald. McDonald testified that she, her husband Larry, her two children, and one of their friends were in the house that night. She testified that it was about midnight when she heard "knocks on all the doors, all the windows." She and her family became afraid because it sounded to them as if someone was running around the house knocking. McDonald's husband opened the door and Susan "almost knocked [Larry] down trying to get into [the] house." McDonald did not know who Susan was, but she noticed that the child was holding a telephone, was wearing only a tee shirt and shorts, and was not wearing any shoes. Susan was screaming, crying, and saying, "He raped me. He raped me." When they asked her the identity of the person to whom she referred, Susan said that Webb had raped her and told her that if she told anyone, "he was going to kill her and whoever she told."[5] McDonald described Susan as "absolutely hysterical." McDonald and her husband tried to calm Susan, and they called 9-1-1 for police assistance. It is a portion of McDonald's testimony that is the basis of one of Webb's complaints on appeal.

Randall Baggett, a deputy with the Bowie County Sheriff's Department, was the first to arrive at McDonald's house. He described Susan as "distraught, upset, looked like she'd been crying, looked like she was scared." She said that her grandfather, Webb, had raped her in his bedroom and related what she said had occurred to upset her. Between midnight and 1:00 a.m., other officers arrived at McDonald's house, and they went next door to speak with Webb. He invited the officers inside, and when asked if anyone else was in the house, he said his

---

[5]McDonald testified that Webb had been married to her mother and that he had continued living next door since she passed away.

4

granddaughter was "in the back bedroom." Baggett testified that "someone had asked him you know, if he knew why we were there, and he said that his granddaughter could've possibly made a statement that he had did something sexual or he hit her or hurt her, something of that nature." Brent Caudle (a lieutenant with the Bowie County Sheriff's Department) said that he remembered Webb's answer to the question being, "Well, I guess it, you know, maybe I did something sexual or I assaulted my granddaughter."

Webb consented to a search of the house by the deputies, who collected the bedding from Webb's bed, the pajama bottoms that Webb was wearing, and a washcloth that was on the nightstand. The officers photographed Webb, the bed, bedding, bedroom, living area, bathroom, and other areas of the house. Baggett testified that Webb told the officers that they "may find something on that bedding as a couple of mornings earlier he woke up aroused." Baggett further testified that Webb seemed nervous when he was responding to questions that were posed to him and that "he'd come up with an answer for everything before we even asked him a question a lot of times . . . as he had his story together before we were questioning." After a forensic examination, Webb's DNA was found on Susan's bra and panties, and semen was found on Webb's sheets.

Melissa testified that by the time she arrived, the police were already there, Susan was very upset, and she "jumped in[to her] arms." They drove to St. Michael's Hospital in Texarkana, where a nurse wrote down Susan's statement of what happened and performed a sexual assault examination on Susan. Susan was later interviewed at the Children's Advocacy Center.

5

**II.     Did the Trial Court Err in Admitting Testimony Regarding the Victim's Veracity?**

In his first point of error, Webb contends that the trial court erred in admitting what Webb maintains was a statement by McDonald that Susan was truthful in what she told McDonald.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Abuse of discretion occurs only if the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). We may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

McDonald testified that a barefooted Susan ran into her house screaming and crying and that "all she was saying was, 'He raped me. He raped me.'" When she asked Susan who she was talking about, Susan told her that Webb had raped her. The State continued its direct examination of McDonald:

> Q      Okay. In addition to just being absolutely hysterical, would you say she was displaying sort of like a frightened demeanor?
>
> A      Yes, ma'am.
>
> Q      Okay. Did she explain to you the reason for her fear?
>
> A      She said that if she told anybody what he did that he was going to kill her and whoever she told.
>
>         . . . .

6

Q       Okay.  [McDonald], you've got kids.

A       (Nodding head yes).

Q       Is that a yes?

A       Yes, ma'am.

Q       You're a social worker.  Is that right?

A       Yes, ma'am.

Q       All right.  You've been around kids your whole life?

A       Yes, ma'am.

Q       Was that child putting on a show that night?

A       No, ma'am, she was not.

Webb objected, arguing,

> [The State was] asking if she was putting on a show.  She's not an expert.
> [McDonald] has no basis to say whether [Webb] was truthful, whether this was a -
> - if she wants to know what her reaction was and her emotions, that's one thing, but
> to state she's telling the truth in what she's inferring, she cannot do that.

The trial court overruled his objection.

Nonexpert testimony may be offered to support the credibility of a witness in the form of opinion or reputation, but the evidence may refer only to character for truthfulness or untruthfulness.  TEX. R. EVID. 608(a).  A lay witness may not, under Rule 608, testify as to the complainant's truthfulness in the particular allegations.  *See Schutz v. State*, 957 S.W.2d 52, 72 (Tex. Crim. App. 1997); *Fuller v. State*, 224 S.W.3d 823, 832–33 (Tex. App.—Texarkana 2007, no pet.).

7

Here, we conclude that McDonald did not testify to the veracity of Susan's allegations. The State's question to McDonald inquired as to Susan's emotional state. Thus, after reviewing the testimony, we cannot say that the trial court abused its discretion in allowing the objected-to testimony, because the trial court could have reasonably determined that McDonald testified that in her opinion, Susan was genuinely afraid and hysterical. *See Buhl v. State*, 960 S.W.2d 927, 932 (Tex. App.—Waco 1998, pet. ref'd) (witness allowed to testify to victim's mental state or emotional condition).

Furthermore, even if McDonald's testimony was a statement regarding Susan's veracity, any error in admitting the testimony was harmless. The erroneous admission of evidence for the purpose of demonstrating the nature of a witness' character for truthfulness is nonconstitutional error. *Rhodes v. State*, 308 S.W.3d 6, 10 (Tex. App.—Eastland 2009, pet. ref'd, untimely filed). Thus, we disregard the error unless it affected appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). Substantial rights are not affected by the erroneous admission of evidence if, after reviewing the record as a whole, the appellate court has fair assurance that the error either did not influence or had only a slight effect on the finder of fact. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). In weighing harm, we consider everything in the record, including the evidence, the character of the alleged error and how it might be considered together with the other evidence in the case, the jury instructions, the State's theory, any defensive theories, closing arguments, voir dire, and whether the evidence of guilt is overwhelming. *Id*. at 355–58. In making that determination, this Court is not concerned with whether there was sufficient evidence on which Webb could have been convicted, but rather, whether there is a reasonable possibility the

impermissible testimony might have contributed to the conviction. *See Lopez v. State*, 288 S.W.3d 148, 178 (Tex. App.—Corpus Christi 2009, pet. ref'd).

Webb's defensive theory was that Susan fabricated the allegations, and throughout the trial, Webb focused on inconsistencies between the times, order, and events of Susan's testimony with that of her mother, McDonald, and the nurse who performed the assault examination. Webb argues that McDonald's testimony bolstered Susan's credibility and that "[t]he State's case against [him] hinged exclusively upon the credibility of [Susan]." If McDonald did testify to Susan's credibility, Susan herself testified later in the trial and the then fifteen-year-old girl was cross-examined more extensively than any other witness. Susan testified to the details, circumstances, and extent of Webb's assault on her. Susan testified that a nude Webb got into bed with her, squeezed her breasts, put his finger in her vagina, and made her touch his penis. After he took her pants off, he "stuck his penis in [her]" vagina. Even though she was crying and yelling at him to stop, he did not stop.

Melissa testified that Susan was hysterical during the second telephone call. She told her daughter to run to the neighbor's house. Melissa, McDonald, and Deputy Baggett uniformly testified that Susan was hysterical and said that Webb had raped her. When the police walked next door to speak with Webb, they asked Webb if he knew why they were at his house. Webb said that his granddaughter could have accused him of doing something sexual or hurting her, which the officers found to be a very unusual response. The officers also found it suspicious that Webb seemed to have an explanation waiting for the officers' questions, and while the officers searched

9

Webb's house, he indicated that they may find evidence of sexual activity in the bedding, though he gave them an explanation for it.

Webb's DNA was found on Susan's bra and the waistband and crotch of her panties, and a forensic scientist testified that the levels of DNA present were inconsistent with simply picking up the articles of clothing as Webb claimed. Semen was found on Webb's sheets. However, Susan's medical examination did not reveal any marks or surface injuries, and Susan's pulse and blood pressure were normal.

We have a fair assurance that McDonald's statement that Susan was not "putting on a show" had either only a very slight influence or no influence on the deliberations of the jury. The State did not mention or otherwise emphasize McDonald's statement, and even ignoring McDonald's statement entirely, there was ample evidence supporting and confirming Susan's testimony regarding the assault and indecency. Therefore, any error in allowing McDonald's statement about Susan's truthfulness was harmless. Accordingly, we overrule this point of error.

### III. Did the Trial Court Err in Admitting Webb's Statement?

In his second point of error, Webb argues that the trial court erred in failing to suppress Webb's statements to the police because the statements were made prior to informing Webb of his *Miranda*[6] rights.

Custodial interrogation places "'inherently compelling pressures' on the persons interrogated." *Thompson v. Keohane*, 516 U.S. 99, 107 (1995) (quoting *Miranda*, 384 U.S. at 467). "Prior to any [custodial] questioning, the person must be warned that he has a right to remain

---

[6]*Miranda v. Arizona*, 384 U.S. 436 (1966).

silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney . . . ." *Coffey v. State*, 435 S.W.3d 834, 841 (Tex. App.—Texarkana 2014, pet. ref'd) (quoting *Miranda*, 384 U.S. at 444). "Under both the Federal constitutional standard and the Texas Confession Statute, evidence obtained as a result of a custodial interrogation is inadmissible unless the State proves the officer gave proper warnings and shows an affirmative waiver of rights by the accused."[7] *Id.* at 840–41 (quoting *Hutchison v. State*, 424 S.W.3d 164, 175 (Tex. App.—Texarkana 2014, no pet.) (footnotes omitted)); *see Miranda*, 384 U.S. at 444; *Carter v. State*, 309 S.W.3d 31, 35–36 (Tex. Crim. App. 2010) ("Failure to provide the warnings and obtain a waiver prior to custodial questioning generally requires exclusion of statements obtained."); *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008).

"An officer's obligation to administer *Miranda* warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him "in custody."'" *Stansbury v.*

---

[7]Article 38.22, Section 2, of the Texas Code of Criminal Procedure requires an officer to warn a defendant that

> (1)    he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

> (2)    any statement he makes may be used as evidence against him in court;

> (3)    he has the right to have a lawyer present to advise him prior to and during any questioning;

> (4)    if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

> (5)    he has the right to terminate the interview at any time . . . .

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a) (West Supp. 2017). Section 3 of this Article prohibits use of an accused's oral statement "made as a result of custodial interrogation . . . unless: . . . prior to the statement but during the recording the accused is given the warning [listed above] and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning." TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a) (West Supp. 2017).

*California*, 511 U.S. 318, 322 (1994) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)). Likewise, the Article 38.22 constraints on the use of an accused's statements apply only to custodial interrogations. *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996). Thus, "[i]f an accused is not in custody when he makes a statement, then the question of voluntariness does not arise." *Id.* "Stationhouse questioning does not, in and of itself, constitute custody." *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996).

Here, sometime between midnight and 1:00 a.m., Baggett, Caudle, and two other officers went next door to Webb's house to investigate a sexual-assault allegation in which Webb was the suspect. Webb invited the officers inside, and the officers "began asking a few questions, inquiring had anything occurred earlier in the night and just started trying to carry on a casual conversation with him at that point." Caudle testified that when Webb was asked if he knew why the officers were there that night, he said, "Well, I guess it, you know, maybe I did something sexual or I assaulted my granddaughter."

Five questions later, when the State asked Caudle what else Webb had to say during the officers' visit, Webb objected "to any kind of custodial questioning, anything he said" on the basis that, at that time, Webb had not been advised of his rights under *Miranda.* After hearing the arguments of counsel, the trial court overruled the objection, finding that the questioning was noncustodial, but the court allowed Webb to take Caudle on voir dire.

During Webb's voir dire questioning, Caudle testified that Webb was not Mirandized when the questioning began and explained that the officers' questions were intentionally vague in order to see what information could be obtained unsolicited because suspects sometimes say

incriminating things that could aid the investigation. In response to the State's voir dire questioning, Caudle testified that Webb was not placed under arrest at any point that night, that Webb was not being detained, and that as he had invited the officers into his house, he was free to leave. The trial court overruled Webb's objection, finding that "any statements that were made by the defendant in his house after he invited the police officers in [were] not made as part of a custodial interrogation."

To preserve a complaint for our review, a party must first present to the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling if not apparent from the context. TEX. R. APP. P. 33.1(a)(1). Here, Webb's objection was not timely because the same or similar testimony was previously admitted without objection through Deputy Baggett. *See id.* A party waives error regarding the erroneous admission of evidence if the same or substantially similar evidence has been previously admitted in the proceeding without objection. *Conrad v. State*, 10 S.W.3d 43, 46 (Tex. App.—Texarkana 1999, pet. ref'd). Therefore, this issue was not preserved for our review, and we overrule this point of error.

## III. Is There Sufficient Evidence to Support the Assessment of Court Costs?

In his final point of error, Webb contends that the evidence is legally insufficient to support the trial court's assessment of $534.00 in court costs against him because the clerk's record does not contain a bill of costs. We disagree.

An appellant in a criminal case may challenge on direct appeal the sufficiency of the evidence supporting an assessment of court costs. *Armstrong v. State*, 340 S.W.3d 759, 765–66 (Tex. Crim. App. 2011). To measure the sufficiency of the evidence supporting an assessment of

13

court costs, we review the record in the light most favorable to the assessment. *Whatley v. State*, No. 06-12-00117-CR, 2014 WL 7399130, at *1 (Tex. App.—Texarkana Dec. 30, 2014, no pet.) (mem. op., not designated for publication) (citing *Mayer v. State*, 309 S.W.3d 552, 557 (Tex. Crim. App. 2010)). If a criminal action is appealed, the Texas Code of Criminal Procedure provides that "an officer of the court shall certify and sign a bill of costs stating the costs that have accrued and send the bill of costs to the court to which the action or proceeding is transferred or appealed." TEX. CODE CRIM. PROC. ANN. art. 103.006 (West 2006). Further, "[a] cost is not payable by the person charged with the cost until a written bill is produced or is ready to be produced, containing the items of cost, signed by the officer who charged the cost or the officer who is entitled to receive payment for the cost." TEX. CODE CRIM. PROC. ANN. art. 103.001 (West 2006); *Ballinger v. State*, 405 S.W.3d 346, 348 (Tex. App.—Tyler 2013, no pet.). In addition, a certified bill of costs is not required to be filed either at the time the judgment is signed or before the case is appealed. *Whatley*, 2014 WL 7399130, at *1 (citing *Ballinger*, 405 S.W.3d at 348). Although a bill of costs may not be required in all cases, if the bill of costs has been omitted from the clerk's record, the record may be supplemented to supply the bill of costs. TEX. R. APP. P. 34.5(c)(1); *see Johnson v. State*, 423 S.W.3d 385, 395–96 (Tex. Crim. App. 2014); *Ballinger*, 405 S.W.3d at 348. In this situation, "supplementing the record to include the bill of costs is appropriate and does not violate due process." *Ballinger*, 405 S.W.3d at 349.

Here, the clerk's record contains an itemized bill of costs showing that the total amount of court costs was $534.00. Because the record contains a bill of costs supporting the amount of court

14

costs assessed, we find that there is sufficient evidence to support the trial court's assessment of court costs.  Accordingly, we overrule this point of error.

We affirm the trial court's judgment.

Bailey C. Moseley
Justice

Date Submitted:     December 21, 2017
Date Decided:       February 22, 2018

Publish

15