

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-20-00024-CV

IN RE THE COMMITMENT OF EDDIE THOMPSON

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 88540

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

A Lamar County jury unanimously found, beyond a reasonable doubt, that Eddie Thompson is a sexually violent predator. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.003. Accordingly, the trial court ordered Thompson committed to supervision and treatment pursuant to Chapter 841 of the Texas Health and Safety Code, titled "Civil Commitment of Sexually Violent Predators."

On appeal, Thompson argues that the evidence is not legally or factually sufficient to support the finding that he is a repeat sexually violent predator, the evidence is not factually sufficient to support the jury's finding that he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence, and the trial court erred in admitting evidence of the underlying facts of his sexual criminal conduct. We find that (1) legally and factually sufficient evidence supports the jury's verdict and (2) the trial court did not err in admitting the facts of Thompson's sexual criminal conduct. Therefore, we affirm the trial court's judgment.

*(1)     Legally and Factually Sufficient Evidence Supports the Jury's Verdict*

"A person is a sexually violent predator . . . if the person:  (1) is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *In re Commitment of Renshaw*, 598 S.W.3d 303, 306 (Tex. App.—Texarkana 2020, no pet.) (quoting TEX. HEALTH & SAFETY CODE ANN. § 841.003(a)). "A person is a repeat sexually violent offender . . . if the person is convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses."  TEX.

2

HEALTH & SAFETY CODE ANN. § 841.003(b). "A 'behavioral abnormality' is defined as a 'congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person.'" *Renshaw*, 598 S.W.3d at 306 (quoting TEX. HEALTH & SAFETY CODE ANN. § 841.002(2)).

"The United States Supreme Court requires proof that the person 'has "serious difficulty in controlling [his] behavior" in order to civilly commit him under any [sexually-violent-predator] statute.'" *Id.* (first alteration in original) (quoting *In re Commitment of Stuteville*, 463 S.W.3d 543, 552 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (citing *Kansas v. Crane*, 534 U.S. 407, 413 (2002)). "The inability to control one's behavior 'must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.'" *Id.* (quoting *Stuteville*, 463 S.W.3d at 552) (quoting *Crane*, 534 U.S. at 413).

"With regard to Chapter 841 of the Texas Health and Safety Code, Texas courts have 'held that a "behavioral abnormality" is considered "an abnormality which causes serious difficulty in behavior control."'" *Id.* (quoting *Stuteville*, 463 S.W.3d at 552) (quoting *In re Commitment of Almaguer*, 117 S.W.3d 500, 506 (Tex. App.—Beaumont 2003, pet. denied)). "Thus, '[w]hen a jury finds that a person is a sexually violent predator, that finding entails an implicit determination that the respondent has serious difficulty controlling behavior.'" *Id.* (alteration in original) (quoting *Stuteville*, 463 S.W.3d at 552) (citing *Almaguer*, 117 S.W.3d at

3

505–06). "Also, 'a jury may infer that a respondent has serious difficulty controlling his current behavior based on his past behavior.'" *Id.* at 306–07 (quoting *Stuteville*, 463 S.W.3d at 552) (citing *In re Commitment of Washington*, No. 09-11-00658-CV, 2013 WL 2732569, at \*5–6 (Tex. App.—Beaumont June 13, 2013, pet. denied) (mem. op.)).

"Although the commitment of a person as a sexually violent predator is a civil proceeding, because the burden of proof is beyond a reasonable doubt, 'we review legal sufficiency of the evidence under the appellate standard of review used in criminal cases.'" *In re Commitment of Metcalf*, 602 S.W.3d 609, 618 (Tex. App.—Texarkana 2020, pet. denied) (quoting *In re Commitment of Harris*, 541 S.W.3d 322, 327 (Tex. App.—Houston [14th Dist.] 2017, no pet.)). Thus, in reviewing the legal sufficiency of the evidence supporting the jury's finding that Thompson is a sexually violent predator, "[w]e consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found beyond a reasonable doubt the elements required for commitment." *Id.* (quoting *Harris*, 541 S.W.3d at 327).

In reviewing Thompson's factual-sufficiency challenge, "we weigh all of the evidence to determine 'whether a verdict that is supported by legally sufficient evidence nevertheless reflects a risk of injustice that would compel ordering a new trial.'" *Renshaw*, 598 S.W.3d at 307 (quoting *Stuteville*, 463 S.W.3d at 552) (quoting *In re Commitment of Day*, 342 S.W.3d 193, 213 (Tex. App.—Beaumont 2011, pet. denied)). "We 'view all of the evidence in a neutral light and ask whether a jury was rationally justified in [its] finding . . . beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Stuteville*, 463 S.W.3d at 552) (quoting *Day*, 342 S.W.3d at 206).

4

"We will . . . reverse [only] if, after weighing the evidence, we determine that 'the risk of an injustice remains too great to allow the verdict to stand.'" *Id.* (alteration in original) (quoting *Stuteville*, 463 S.W.3d at 552) (quoting *Day*, 342 S.W.3d at 213). "In conducting our review, we may not substitute our judgment for that of the jury[,] which is the sole judge of the credibility of witnesses and the weight to be given to their testimony." *Id.* (alteration in original) (quoting *Stuteville*, 463 S.W.3d at 552) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)).

a.      *Legally and Factually Sufficient Evidence Supports the Finding that Thompson Is a Repeat Sexually Violent Offender*

Thompson first challenges the finding that he is a repeat sexually violent offender. At trial, the State introduced the following: (1) three convictions for the aggravated sexual assault of J.S., a child, committed on January 1, 1991; (2) two convictions of indecency with J.S., a child, by sexual contact occurring on January 1, 1991; (3) two convictions for the aggravated sexual assault of J.T., a child, committed on November 1, 2002; and (4) one conviction of indecency with J.T., a child, by sexual contact occurring on November 1, 2002. Each of these convictions carried a sentence of fifteen years' imprisonment, and the judgments for each were signed on February 3, 2006. The State also introduced a 1989 conviction for injury to a child that, pursuant to a plea agreement, carried a sentence of ten years' community supervision.

"A person is a repeat sexually violent offender . . . if the person is convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses." TEX. HEALTH & SAFETY CODE ANN. § 841.003(b). Despite his five convictions for aggravated sexual assault and three convictions for indecency with two different children and the sentences of

5

imprisonment for each, Thompson argues that he is not a repeat sexually violent offender because he "received his convictions on the same day and has not been shown to have repeated his bad behavior after punishment."

Yet, the indictments for the offenses show that they occurred on different dates against two separate victims. Thus, Thompson meets the definition of a repeat sexually violent offender under Section 841.003(b) of the Texas Health and Safety Code. Moreover, Thompson's argument that he is not a repeat sexually violent offender because the judgments of conviction were signed on the same day has been expressly rejected by our sister courts, with which we agree. *In re Commitment of Smith*, 562 S.W.3d 800, 804–05 (Tex. App.—Amarillo 2018, no pet.) (rejecting the argument that the defendant was not a repeat sexually violent predator because he was convicted on a single occasion of offenses against a single victim in a single criminal episode); *In re Commitment of Hall*, No. 09-09-00387-CV, 2010 WL 3910365, at *2–3 (Tex. App.—Beaumont Oct. 7, 2010, no pet.) (mem. op.) (rejecting defendant's argument that "repeat sexually violent offender" does not mean "one who committed the same offense twice in the same criminal episode with the same person on the same day"). Therefore, we conclude that the State introduced legally and factually sufficient evidence proving, beyond a reasonable doubt, that Thompson was a repeat sexually violent offender.

b.    *Factually Sufficient Evidence Supports the Jury's Behavioral-Abnormality Finding*

Next, we address Thompson's argument that the evidence is factually insufficient to show that he suffered from a behavioral abnormality that made him likely to engage in a

6

predatory act of sexual violence.[1]  On this issue, the State introduced the testimony of its qualified expert, J. Randall Price, a licensed and board-certified forensic psychologist and sex-offender treatment provider.

Price testified that Thompson's own statements and the records of his past sexual offenses, including police reports and victim statements, were important to show "the motivation of the offender, how they committed the offense, . . . what level of coercion might be involved, what their relationship to the victim [was,]" and if the victim was a child.  From this information, Price said he could assess Thompson's emotional and volitional capacity, the persistence of the behavior, the presence of a sexual disorder, and the likelihood of reoffending.

Price diagnosed Thompson with chronic pedophilia of prepubescent children and stated that he had "persistent pedophilic sexual urges."  Price testified that J.S., Thompson's stepdaughter, was six years old at the time of the offenses and that the convictions that occurred for conduct in 1991 resulted from Price, who was twenty-four, causing the penetration of J.S.'s mouth with his sexual organ, inserting his finger into J.S.'s sexual organ, using his mouth to contact her sexual organ, touching her breast, and causing her to touch his sexual organ. According to Price, Thompson said, "I touched her breast and vagina, I licked her vagina, I tried to have sex with her, it went on for 2 to 3 times a week for 4 to 5 years, I couldn't stop trying to have sex with her."  He added that he was drunk every day and "wouldn't listen or pay attention when she said no."  Price testified that Thompson's statements showed that he could not control the inappropriate desires that were affecting his emotional or volitional capacity.

---

[1]Thompson does not challenge the legal sufficiency of the evidence supporting this finding.

7

According to Price, the convictions that occurred in November 2002 were for sexual conduct that thirty-five-year-old Thompson engaged in with his biological daughter, J.T., who was eight at the time of the offenses. Price testified that Thompson contacted the child's anus, penetrated her sexual organ with his sexual organ, and touched her breast. Price said the later acts "show[ed] persistence of the pedophilic disorder" and a lack of regard for his relationship with the victim. Price said Thompson told him that "[J.T.] looked older, she was pretty, she'd wear tight clothes and no panties to tempt [him], [and] it seem[ed] like she liked it." Thompson claimed that "it was a one-time deal" that began after J.T. "pulled her pants down and showed him she had pubic hairs."

Price also said that Thompson had chronic antisocial personality disorder and that there was "some evidence of conduct disorder prior to the age of 15 based on what [Thompson] told [him]," which showed a disregard for the safety of others, impulsivity, victim blaming, and failing to take responsibility for bad acts toward victims. Thompson admitted that, while he was a child, he skipped school, was suspended from school a couple of times and expelled for fighting, broke into and damaged his school because he "just had an urge for doing it," and dropped out in the tenth grade.

Price used tests "standard in the field," including the Static-99R, the psychopathy checklist, and the Risk for Sexual Violence Protocol (RSVP), all used for measuring the risk of reoffending. While Thompson "had an average level of psychopathic traits for an inmate" and scored a zero on the Static-99R,[2] the RSVP showed that Thompson was at risk of reoffending.

---

[2]Price testified that that Static-99R's highest score is 12 and lowest score is -3.

8

In particular, Price testified that the multiple offenses committed by Thompson, alcohol abuse, antisocial personality disorder, lack of impulse control, persistent pedophilia, adult-like descriptions of J.T., willingness to offend in a public place or where others were present, lack of involvement in any sex-offender treatment program, and victim blaming were risk factors showing that he would likely reoffend. Price opined that Thompson did not understand his sexual deviance and had a congenital or acquired behavioral abnormality that affected his emotional and volitional capacity that predisposed him to commit further sexually violent offenses.

During cross-examination, Price admitted that there was no evidence of Thompson's use of alcohol while in jail, that the selection of strangers of victims posed more of a risk than selection of family members as victims, that Thompson was not accepted into a sex-offender treatment program, and that his pleas of guilty to his offenses could be a form of taking responsibility for his actions.[3] Price testified that "as many as 80 percent of prison inmates could be diagnosed with antisocial personality disorder," that being diagnosed with pedophilia did not alone show that a person had a behavioral abnormality, and that Thompson's Static-99R score placed him at below average risk for reoffending. Yet, Price explained that Thompson's "persistence of his sex offending was not captured on the Static-99R because he wasn't caught or sanctioned after the 1991 offenses . . . until . . . 2006."

---

[3]Price testified that Thompson was approved for the sex-offender educational program, which is not a treatment program. Thompson also said he had taken a course called "Christians Against Sex Addiction," but said he did not know whether the course was designed for pedophiles and affirmed that he learned nothing from the course.

At trial, Thompson admitted that he drank heavily throughout his adult life and could not control his habit, even when he was placed on community supervision for injuring a child when he was twenty-two. He also admitted that he was sexually attracted to J.S., that he committed multiple sexual offenses with J.S. even while on community supervision, and that the threat of going to prison did not deter him. Even though the judgments of conviction for acts committed against J.S. recited that the child was six at the time of the offenses, Thompson said, "I don't believe it was six years old . . . I didn't really mess with her until she was about 10 or 13."

When confronted with judgments and indictments, Thompson admitted that his penis was in J.S.'s mouth and that J.S. touched his penis but claimed that he "didn't force nothing on her" because "[s]he grabbed a hold of it and put it into her mouth." When first asked if J.S. wanted to touch his penis or place it in her mouth, Thompson responded, "I don't know." Thompson also said he put his finger in J.S.'s vagina, but did not force the act, and could not remember placing his mouth on her vagina or touching her breasts. Thompson blamed his alcohol intoxication for his commission of all sexual acts with J.S. and the failure to recall some of them. Even so, he admitted to sexually abusing J.S. for four to five years.

As for J.T., Thompson claimed that the child was ten even though the judgments convicting him of the offenses recited that J.T. was an eight-year-old child. Thompson said he tried to penetrate J.T.'s anus but stopped, denied being sexually attracted to her, again blamed alcohol for the incident, and confirmed that he had never received any treatment for alcohol abuse even though he considered himself an alcoholic. He also denied touching J.T.'s vagina or

10

breasts. Thompson claimed Price was a liar when testifying that Thompson claimed J.T. tried to tempt him but admitted that he testified the child was tempting him during his deposition.

Thompson also admitted that he was a sex addict in the past and said it was "possible" that he might need sex-offender treatment. Yet, he denied being attracted to children, claimed he was not a sexual offender, and had no understanding of why he had abused J.S. or J.T. Thompson testified that he wished to obtain his G.E.D., get into welding school, attend Alcoholics Anonymous, and live in Paris, Texas, with his brother once out of prison. Thompson agreed that he could have completed his G.E.D. and attended Alcoholic Anonymous in prison but did not do so. He testified that he would not be around any children and would follow sex-offender-registration requirements.

Thompson argues that the evidence is factually insufficient to support the jury's behavioral abnormality finding because he believes "Price concentrated . . . almost entirely on Thompson's commission of his 1991 and 2002 offenses," for which he has already served fourteen years of imprisonment. In support, Thompson cites *In re Commitment of Stoddard*, 601 S.W.3d 879 (Tex. App.—Fort Worth 2019, pet. granted) (mem. op. on reh'g), a split decision by a three-judge panel of the Fort Worth Court of Appeals that sustained a factual-sufficiency challenge. *Stoddard* noted that, in most cases surveyed by the court, "civilly committed sexually violent predator[s] had a history of multiple sexual offenses over an extended period of time," while Stoddard "had only the two convictions for aggravated sexual assaults" against two young children, had a related conviction for child pornography, and was accused of receiving oral sex from one of the children ten or eleven times. *Id.* at 881, 893. The Second Court of Appeals also

11

discounted expert testimony that Stoddard's Static-99R score was 4, he was in the above average range of reoffending, he was diagnosed with pedophilia, and that his minimalization and denial of the charges against him, substance abuse in the past, and anti-social and psychopathic traits all posed a risk of reoffending. *Id.* at 885–88. Understandably, Thompson urges us to apply *Stoddard.* The *Stoddard* case will be reviewed by the Texas Supreme Court, which has granted the State's petition for review, and the question of whether the Second Court of Appeals reweighed the evidence and substituted its opinion for that of the fact-finder will be decided by the high court. Instead of looking to *Stoddard*, we apply our own precedents in deciding this case.

"[A] person's psychopathy is not a requisite finding that must be made in support of his commitment as a sexually violent predator." *Renshaw*, 598 S.W.3d at 313 (quoting *In re Commitment of Hebert*, 578 S.W.3d 154, 159 (Tex. App.—Tyler 2019, no pet.)). "Moreover, civil commitments have been upheld even when the person scored a zero on the STATIC-99R." *Id.* (citing *In re Commitment of Ramshur*, No. 09-17-00286-CV, 2018 WL 6367529, at *2 (Tex. App.—Beaumont Dec. 6, 2018, no pet.) (mem. op.)). Although (1) Thompson's standardized evaluation scoring was low, (2) he was not diagnosed with psychopathy, and (3) his sexual offenses were adjudicated at the same time, this case is far removed from *Stoddard* because, unlike Stoddard's offenses, which arose from the same time period, the evidence showed that Thompson had a further history of pedophilic behavior. *See id.*

Thompson himself testified that he abused J.S. for four to five years. He admitted to the jury that he acted on his sexual attraction to J.S. while on community supervision, because the

12

threat of going to prison did not deter him. According to Price, Thompson told him that the abuse occurred two to three times a week and that he "couldn't stop trying to have sex with" the child. Eleven years later, he was abusing J.T. This evidence supported Price's diagnoses of chronic pedophilia of prepubescent children and showed Thompson's "persistent pedophilic sexual urges" that he had "serious difficulty in controlling." *Renshaw*, 598 S.W.3d at 306 (quoting *Stuteville*, 463 S.W.3d at 552).

The jury heard of Thompson's many risk factors indicating a likelihood that he would reoffend. Unlike *Stoddard*, (1) Thompson was diagnosed with a chronic antisocial personality disorder that contributed to impulsivity and lack of understanding of the impact of his actions on others, and (2) he also admitted that his alcohol addiction, for which he had never received any treatment, had contributed to the sexual abuse of children. For example, Thompson told Price that he was drunk every day and "wouldn't listen or pay attention when [J.S.] said no" to his sexual abuse. Price testified that Thompson did not understand his sexual deviance, and Thompson's testimony confirmed that he had no understanding of why he had sexually abused J.S. and J.T.

Thompson was also unrehabilitated. He testified that he learned nothing from the Christians Against Sex Addiction course that he had taken. This was also shown through (1) Thompson's testimony that he did not force J.S., a six-year-old child, to engage in acts of sexual abuse and (2) his statements to Price that eight-year-old J.T. looked older, was pretty, would tempt him with her choice of clothing, and seemingly enjoyed her father's sexually abusive acts.

13

"[A] jury may infer that a respondent has serious difficulty controlling his current behavior based on his past behavior." *Renshaw*, 598 S.W.3d at 306–07. Here, after we have weighed all the evidence, we deem it factually sufficient to support the jury's finding that Thompson suffers from a behavioral abnormality that made him likely to engage in a predatory act of sexual violence.

Due to our findings above, we overrule Thompson's evidentiary sufficiency issues.

*(2)*     *The Trial Court Did Not Err in Admitting the Facts of Thompson's Sexual Criminal Conduct*

Price testified about Thompson's prior offenses at trial. "In a civil proceeding, '[e]videntiary rulings are committed to the trial court's sound discretion.'" *Renshaw*, 598 S.W.3d at 314 (quoting *In re Commitment of Price*, No. 06-16-00077-CV, 2017 WL 2299141, at *1 (Tex. App.—Texarkana May 26, 2017, pet. denied) (mem. op.) (alteration in original) (quoting *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam)). "A trial court abuses [its] discretion when it acts without regard for guiding rules or principles." *Id.* (alteration in original) (quoting *Price*, 2017 WL 2299141, at *1 (quoting *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012))). "We will not reverse unless the error probably caused the rendition of an improper judgment." *Id.* (quoting *Stuteville*, 463 S.W.3d at 554) (citing TEX. R. APP. P. 44.1(a)(1)).

Price testified that, in rendering his expert opinion, he relied on the facts of Thompson's past crimes, including police reports, victim statements, and Thompson's own admission of unadjudicated offenses. "An expert in a Chapter 841 'civil commitment proceeding may

disclose details regarding the underlying facts or data that the expert relied on in arriving at her opinion.'" *Id.* (quoting *Stuteville*, 463 S.W.3d at 554–55) (citing TEX. R. EVID. 705(a) ("expert may . . . disclose on direct examination, or be required to disclose on cross-examination, the underlying facts or data"); *In re Commitment of Anderson*, 392 S.W.3d 878, 882 (Tex. App.—Beaumont 2013, pet. denied)). "'[H]aving an expert explain the facts he considered, including past sexual offenses, and how those facts influenced his evaluation, assists the jury in weighing the expert's opinion on the ultimate issue' of whether a person is a sexually violent predator." *Id.* (alteration in original) (quoting *Stuteville*, 463 S.W.3d at 555).

While Thompson did not object, under Rule 403, to the prior convictions or the indictments on which they were based, Thompson's objection focused on Price's testimony regarding the underlying facts of those cases. Thompson argued, "[T]he prejudicial effect is so large that there's no probative value in the underlying facts if he can talk about the indictments and what Mr. Thompson was convicted of." Thompson noted that Price had testified on voir dire that he could form an opinion without the details related to the convictions that were not included in the indictments.

Despite Rule 705, Thompson argues that the trial court erred in overruling his objection, under Rule 403, to Price's testimony about the underlying facts of his convictions. In large part, we find that Thompson failed to preserve this issue because many of the underlying facts of the

15

convictions were included in the indictments, which were admitted into evidence before Price's testimony without a related objection.[4]

"To preserve a complaint for our review, a party must first present to the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling if not apparent from the context." *Webb v. State*, 557 S.W.3d 690, 698 (Tex. App.—Texarkana 2018, pet. ref'd) (citing TEX. R. APP. P. 33.1(a)(1)). The indictments and judgments admitted here revealed the underlying facts that, on or about January 1, 1991, Thompson penetrated six-year-old J.S.'s mouth with his sexual organ, inserted his finger into J.S.'s sexual organ, contacted J.S.'s sexual organ with his mouth, made the child touch his penis, and touched J.S.'s breast with his hand. They also showed that Thompson, in or about November 2002, caused the anus of eight-year-old J.T. to contact Thompson's sexual organ, contacted or penetrated J.T.'s sexual organ with his penis, and touched J.T.'s breast with his hand. Therefore, Thompson's objection to Price's testimony about these underlying facts "was not timely because the same or similar testimony was previously admitted without objection" through the indictments. *Webb*, 557 S.W.3d at 698. "A party waives error regarding the erroneous admission of evidence if the same or substantially similar evidence has been previously admitted in the proceeding without objection." *Id.* (citing *Conrad v. State*, 10 S.W.3d 43, 46 (Tex. App.—Texarkana 1999, pet. ref'd)). As a result, a large part of Thompson's issue was not preserved for our review.

However, Price did reveal facts not in the indictments, including that J.S. was Thompson's stepdaughter and J.T. was Thompson's biological daughter. He also testified about

---

[4]The indictments were a part of Thompson's penitentiary packet. Thompson's only objection was to the "mugshots of Mr. Thompson being used" and a "redaction on page 2."

16

Thompson's version of the events, which lead to testimony that Thompson tried to have sex with J.S. "2 or 3 times a week for 4 or five years," that he could not stop trying to have sex with J.S, that J.S. had grabbed his penis and put it in her mouth, and that J.T. pulled her pants down and showed him she had pubic hair, looked older, tried to tempt him, and seemed to like his sexual abuse.

Rule 403 of the Texas Rules of Evidence states that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." *Renshaw*, 598 S.W.3d at 314 (quoting TEX. R. EVID. 403). "Factors considered when applying the Rule 403 balancing test 'include the probative value of the evidence, the potential of the evidence to impress the jury in some irrational way, the time needed to develop the evidence, and the proponent's need for the evidence.'" *Id.* (quoting *Stuteville*, 463 S.W.3d at 555) (quoting *Anderson*, 392 S.W.3d at 882). "Evidence is unfairly prejudicial when it has an undue tendency to suggest that a decision be made on an improper basis, commonly, but not necessarily, an emotional one." *Id.* (quoting *Anderson*, 392 S.W.3d at 882).

In civil commitment cases, "evidence of . . . sexual offenses, when . . . used by experts, is 'highly probative and helpful to the jury in explaining the basis of [the expert's] opinion that [a person] has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.'" *Id.* (quoting *Stuteville*, 463 S.W.3d at 556). "For this reason, experts in civil commitments may disclose underlying facts that the expert relied on 'including the details of adjudicated and unadjudicated sexual assaults.'" *Id.* at 314–15 (quoting *In re Commitment of Mark Edward Langford*, No. 01-18-01050-CV, 2019 WL 6905022, at *3 (Tex. App.—Houston

17

[1st Dist.] Dec. 19, 2019, no pet.) (mem. op.)); *see Metcalf*, 602 S.W.3d at 620. Here, Price specifically testified that Thompson's relationship to his victims and his own version of the events were necessary in assessing his risk of reoffending. Therefore, the probative value of Price's testimony "weigh[ed] greatly in favor of [its] admission." *Renshaw*, 598 S.W.3d at 315.

Next, the second and third factors support admission of the evidence. Thompson does not show how the additional facts had the "potential to impress the jury in some irrational way." *Id.* In fact, Price testified that his relationship with his victims lowered his risk of reoffending. Also, we do not conclude that Thompson's accounts of the offenses, while they supported Price's opinion of a higher risk of reoffending, would impress the jury in an irrational way given the details of the sexual abuse already admitted without objection. As for the third factor, Price did not spend much time discussing the underlying facts that were not revealed in the indictments.

Moving to the fourth factor, we find that the need to present Thompson's relationship to the victims and version of the events "to show the basis of the expert's opinion that [Thompson] suffered from a behavioral abnormality was also great." *Id.* Without this evidence, the jury would not have heard Thompson's minimalization of the offenses, victim blaming, and claims that young children were tempting him and enjoying his sexual abuse. Without such evidence, "the jury would not be basing its verdict on the full picture of [Thompson's] sexual deviancy, and the evidence may have been factually insufficient to find that [Thompson] was a sexually violent predator." *Id.* Thus, this factor also weighs heavily in favor of admission.

Therefore, we find, the trial court did not abuse its discretion in ruling that the probative value of Price's testimony about Thompson's relationship with the victims and his accounts of

18

the offenses was not substantially outweighed by the danger of unfair prejudice. We overrule this point of error.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice


Date Submitted:     August 28, 2020
Date Decided:      October 15, 2020