

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-20-00024-CR

_____


TONY GENE WILLIAMS, SR., Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 4th District Court
Rusk County, Texas
Trial Court No. CR18-130


Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

A Rusk County jury convicted Tony Gene Williams, Sr., of aggravated robbery. Williams pled true to the State's punishment enhancement allegations during a bench trial on punishment and was sentenced to life imprisonment. On appeal, Williams argues that his conviction is not supported by legally sufficient evidence, that jailhouse testimony was not sufficiently corroborated, and that the trial court erred in two evidentiary rulings.

We find that (1) legally sufficient evidence supports Williams's conviction, (2) the jailhouse testimony was sufficiently corroborated, and (3) there was no abuse of discretion in the trial court's evidentiary rulings that are preserved for our review. As a result, we affirm the trial court's judgment.

## *(1)* *Legally Sufficient Evidence Supports Williams's Conviction*

Williams claims his conviction is not supported by legally sufficient evidence. Although the evidence against him is circumstantial, we disagree.

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to

2

draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

Here, the State's indictment alleged that Williams, on or about January 11, 2014, "did then and there while in the course of committing theft of property and with intent to obtain or maintain control of the property, intentionally and knowingly threaten or place Donald Clark, a person 65 years of age or older, in fear of imminent bodily injury or death." The evidence at trial suggested that someone entered Clark's home, struggled with Clark, who was in his seventies, and pointed a gun at him, thereby placing him in fear of imminent bodily injury or death. However, Williams argues that the evidence was insufficient to show that he was the perpetrator of the crime or that he was in the course of committing theft of property.

The victim's nephew, Alan Scott Clark, lived with his parents near Clark, who lived alone in a trailer. Alan explained that Clark did not trust banks, always dealt in cash, would cash his social security checks, and would provide Alan with the money to pay his bills. On the night of the offense, Alan testified that he left Clark's home around 4:30 or 5:00 p.m. with money to

3

pay Clark's bills. As he was leaving, Alan saw "a grayish-colored, older-model car, either like an LTD or something like that. It had a big square back end in the driveway." When Alan returned the next morning, he noticed that the front door was open and found Clark dead inside of the home with a "hole in his left eye." Alan dialed 9-1-1.

Noel Martin, a crime scene investigator with the Smith County Sheriff's Department, testified that the trajectory of Clark's gunshot wound was from the front to the back. In describing the scene of the murder, Alan testified that there was blood on the walls and carpet and a hole in Clark's glasses that were found on the floor. Alan said that Clark was wearing the same clothes from the night before and that his TV dinner tray was flipped over onto the ground. Martin and Ben Reynolds, also a criminal investigator with the Rusk County Sheriff's Office who responded to the crime scene, both testified that there was evidence of a struggle between Clark and the perpetrator of the crime.

Reynolds testified that officers found at the scene "a [paper] money band showing to be for $1,000.00," but that the cash that was once contained by the money band was gone from it and that Clark's wallet was not on his person. Alan testified that Clark carried a lot of money in his wallet, which was later found on the side of the road with its contents scattered. Because he did not live in the home, Alan could not recall if anything else was missing. Reynolds testified that he collected two cigarette butts from "some 20, 30 feet" in front of the residence and submitted them for DNA analysis in case they could assist in revealing the identity of the perpetrator.

Alan's description of the vehicle was the only clue early in the investigation. Jonathan Rhoades, a Rusk County Sheriff's Office investigator, testified that he was briefed to be on the lookout for a "late-model Ford sedan, light blue-gray in color . . . having a box shape." Steve Goodson, a detective with the Kilgore Police Department, testified that Williams was in the passenger seat when a car meeting that description was stopped for failing to use a turn signal on January 24.

Reynolds testified that Charles Helton, a chief deputy with the Rusk County Sheriff's Office, said he received a tip that Charlene Marie Jackson might have some information related to the murder. According to Reynolds, his conversations with Jackson steered the investigation towards Williams.

At trial, Jackson admitted that she was a drug addict and a prostitute and had been imprisoned for theft since the murder but explained that she was with Williams on the day of Clark's death. Jackson said that she was hanging out under a tree on Rogers Street where many people, including Williams, got together to drink, smoke cigarettes, play music, and barbecue. Jackson testified that Williams, who knew she was a prostitute, asked her if she wanted to make some money. Jackson agreed and said that Williams drove her, in a vehicle matching the description given to Rhoades, to a house, which she later identified as Clark's trailer. According to Jackson, she, Williams, and Clark sat and talked in the home and drank a beer. Williams told Clark he had brought Jackson over for him, but Clark was not interested, said he had something to do, and asked them to leave. Jackson said that she bummed a cigarette from Clark, who gave her $15.00 from his wallet even though she did not prostitute herself. According to Jackson,

5

Williams saw Clark giving her money. Jackson testified that she walked to Williams's vehicle and watched as Williams and Clark talked outside before Williams returned to the vehicle. She said that Williams later told her that Clark had also given him money.

Jackson testified that she and Williams left Clark's house, obtained crack cocaine from a dealer, and smoked it together. During the drive, Jackson said that "the conversation came up about robbing Mr. Clark" and that Williams asked her if she had a toy gun and a mask. Jackson replied that she did not and asked to be let out of the car because Williams's comment scared her and she "didn't want no part of nothing." Jackson said that Williams dropped her off at "the tree" and that she later heard that Clark was killed.[1] During cross-examination, Jackson admitted that Williams never said he was going to rob anyone and did not comment on whether Clark had a lot of money but only asked her if she had a toy gun and a mask.

After talking with Jackson, Reynolds interviewed Williams. Initially, Williams denied knowing Clark, but later admitted that he had done some work for Clark's brother. Williams told Reynolds that people were lying about him and that he did not know or hang out with Jackson, was never at Clark's house, and did not kill anyone. When asked by Reynolds why his vehicle was seen outside of Clark's home, Williams said it was his mother's car, which prompted Reynolds to ask how Williams came to that conclusion since Reynolds had not provided Williams with any description of the vehicle and did not indicate whether the suspect vehicle was a car or truck. Williams did not explain his comment that it was his mother's car, but repeatedly said that it was not his vehicle and that he drove a Tahoe. Later in the interview,

_____

[1]Jackson did not state what time she went to Clark's home or what time she was dropped off by Williams.

6

Jackson admitted that he occasionally drove his mother's car but remained adamant that he did not hang out near or around Clark's home. Reynolds testified that he observed a vehicle matching Alan's description of the suspect vehicle, which was registered to Williams's mother, at Williams's residence. Reynolds also said that Williams had a "90s model Tahoe" that was not working at the time he observed it.

Reynolds testified that Jackson voluntarily submitted a DNA sample and that he obtained a sample from Williams after securing a search warrant authorizing the collection. Melissa Haas, DNA section supervisor for the Texas Department of Public Safety Crime Laboratory in Garland, Texas, tested the DNA from the cigarette butt that Reynolds found outside of Clark's home and compared it to samples collected from Jackson and Williams. Hass's analysis and report showed that the cigarette butt contained a DNA mixture of three individuals that was "7.41 quintillion times more likely if the DNA came from Charlene Jackson" and "89.5 quadrillion times more likely if the DNA came from Tony Williams, Sr." As a result, Jackson and Williams could not be excluded as contributors to the DNA profile on the cigarette butt.[2]

Yet, Jackson and Williams were excluded as contributors to the DNA found on Clark's wallet, which came from Clark and two unknown individuals, and were also excluded as contributors to the fingerprints that Martin found inside Clark's home. Martin admitted that he found nothing indicating that Williams had been in the house, and Reynolds admitted that no one, including Alan, had identified Williams's mother's vehicle as the vehicle that was seen at

---

[2]Clark was excluded as a contributor of the DNA on the cigarette butt. The second cigarette butt was not tested.

Clark's house on the day of the murder.[3] Reynolds agreed that there was no evidence that Clark had any cash in the home or that Williams had obtained any money after the murder. Reynolds also admitted that he had spoken with a man named Billy Boswell about Clark's stepson, David Miller, and that Boswell said Miller took money from Clark, took advantage of him, had beaten him nearly to death in the past, and had beaten him unconscious several times.

The jury also heard from Sabrian Shunte Alexander, who was in jail for forgery of a financial instrument and had committed other forgeries, burglary of a habitation, and parole violations. Alexander testified that Williams spoke with him about the case while in jail for the purpose of having him conduct research in the law library. According to Alexander, Williams admitted that he knew Clark and that "he went there on several occasions to originally purchase [a] tow truck. And then he took a female there with him" to have sex with "Mr. Clark to obtain the truck." According to Alexander, Williams admitted to taking guns, jewelry, a generator, and a nail gun from Clark's home. Alexander later said that he pawned a generator that he thought came from Clark's home, without explaining how he obtained the generator, and officers later confirmed that it did not come from Clark's home. Also, no one could confirm whether guns, jewelry, or a nail gun were missing from Clark's home. While he initially testified that he had gotten along with Williams in jail, cross-examination showed that the two had engaged in fist fights while confined.

After Alexander's report, investigators called Alan to ask if there was a tow truck on Clark's property. Alan testified that his dad's "wench truck," also referred to as a "gin pole

___

[3]Even though a photograph of the car was shown to the jury at trial, Alan was not asked to identify the photograph as depicting the car he had seen in Clark's driveway.

truck" was parked beside Clark's trailer and that they had previously used it to move and haul things on the farm.

After hearing this evidence, the jury convicted Williams of aggravated robbery.

Pointing to the lack of physical evidence linking Williams to anything inside of Clark's home, Williams's denials during his interview, lack of testimony indicating that anyone saw Williams with a weapon, and the theory that Miller or someone else may have committed the crime, Williams argues that the evidence was legally insufficient to establish that he committed the offense.[4]

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Williamson*, 589 S.W.3d at 297 (quoting *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985))). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the

---

[4]A law-of-parties instruction was submitted to the jury based on DNA from an unknown person found on the cigarette butt and fingerprints from unknown persons found on the wallet. However, only DNA from Jackson, Williams, and Clark was used to compare the DNA and fingerprint samples, and nothing proved that any unknown person was present during the commission of the offense. Moreover, "[a] conviction for an aggravated offense must be supported by evidence that the defendant committed, or was criminally responsible for committing, the aggravating element." *Jackson v. State*, 487 S.W.3d 648, 654–55 (Tex. App.—Texarkana 2016, pet. ref'd) (quoting *Wyatt v. State*, 367 S.W.3d 337, 341 (Tex. App.—Houston [14th Dist.] 2012, pet. dism'd) (citing *Stephens v. State*, 717 S.W.2d 338, 340–41 (Tex. Crim. App. 1986))). "Thus, in an aggravated robbery case involving a defendant who is charged as a party to the offense, it is insufficient to merely prove that the defendant intended to promote or assist a theft; rather, the State must prove that the defendant intended to promote or assist an aggravated robbery by soliciting, encouraging, directing, aiding, or attempting to aid another person in committing the aggravated robbery." *Id.* at 655 (citing *Wyatt*, 367 S.W.3d at 341; *Wooden v. State*, 101 S.W.3d 542, 548 (Tex. App.—Fort Worth 2003, pet. ref'd)). Here, because we find sufficient evidence that Williams was the primary actor, we need not decide whether Williams was liable as a party to the offense.

conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004))).

"Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018) (citing *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004))). In drawing reasonable inferences, the jury "may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life." *Id.* (citing *Duren v. State*, 87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, pet. struck); *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring)).

Viewed in a light most favorable to the jury's verdict, the evidence showed that Williams picked Jackson up where she was hanging out under a tree on Rogers Street for the purpose of prostituting her to Clark. Alexander testified that Williams's intent was to obtain the gin pole truck from Clark in return. Jackson testified that Williams drove to Clark's home in a vehicle belonging to his mother, which matched Alan's description of the vehicle in Clark's driveway. According to Jackson, she and Williams were invited into Clark's home and were given money from Clark's wallet before leaving. Jackson and Williams could not be excluded as contributors to the DNA evidence found on a cigarette butt lying twenty to thirty feet from Clark's front door.

10

As a result, the jury could find that Williams went to Clark's home at around 4:30 or 5:00 p.m. on the night of Clark's murder. Testimony from Alan and several officers showed that Clark was murdered after a struggle, indicating that Clark had seen his attacker and was placed in fear of imminent bodily injury.

Jackson testified that, after she and Williams left the home, Williams asked her for a toy gun and a mask, which made her think that Williams intended to rob someone. Alexander testified that Williams admitted to taking items from Clark's home. Although no one could testify about what had been taken, Alan said that Clark kept a lot of money in his wallet, Jackson said that Williams had seen Clark's wallet earlier, and the wallet was recovered after Clark's murder, with its contents strewn about the side of the road.

The jury, as "the sole judge of the credibility of the witnesses and the weight to be given their testimony[, could] 'believe all of [the] witnesses' testimony, portions of it, or none of it.'" *Williamson*, 589 S.W.3d at 297 (quoting *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014). "We give 'almost complete deference to a jury's decision when that decision is based on an evaluation of credibility.'" *Id.* (quoting *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)). As shown by its verdict, the jury believed Jackson's and Alexander's testimony, which placed Williams at the scene of the crime at or near the time of its commission. It could have found, based on Jackson's testimony, that Williams asked for a toy gun and a mask and that Williams decided to rob Clark after he saw his wallet. The jury also viewed Williams's recorded interview, in which Williams denied knowing Jackson or going to Clark's home, and could have determined that Williams lied during the interview and that those lies and the

11

information he volunteered about his mother's car being seen at Clark's home indicated guilt. *See Woodruff v. State*, 330 S.W.3d 709, 723 (Tex. App.—Texarkana 2010, pet. ref'd) (considering defendant's lies as evidence of guilt).

We conclude that, when all of the evidence is viewed in the light most favorable to the jury's verdict, a rational jury could find that Williams, while in the course of committing theft, and with intent to obtain or maintain control of Clark's property, placed Clark, a person over sixty-five, in fear of imminent bodily injury or death. As a result, we find that legally sufficient evidence supports Williams's conviction. We overrule this point of error.

*(2)     The Jailhouse Testimony Was Sufficiently Corroborated*

Williams also argues that Alexander's testimony should have been excluded under Article 38.075 of the Texas Code of Criminal Procedure, which provides, in relevant part:

> (a)     A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed . . . .

> (b)     Corroboration is not sufficient for the purposes of this article if the corroboration only shows that the offense was committed.

TEX. CODE CRIM. PROC. ANN. art. 38.075. The Texas Court of Criminal Appeals has held that testimony from a jailhouse witness "is inherently unreliable due to the inmate's incentive to better his circumstances." *Phillips v. State*, 463 S.W.3d 59, 66 (Tex. Crim. App. 2015). Consequently, "Article 38.075 was enacted in recognition that incarcerated individuals have an

12

incentive to provide information against other incarcerated individuals and that this testimony should be corroborated."[5] *Id.*

The standard for corroboration of jailhouse-witness testimony under Article 38.075 is identical to the standard for corroboration of accomplice-witness testimony under Article. 38.14. *Schnidt v. State*, 357 S.W.3d 845, 851 (Tex. App.—Eastland 2012, pet. ref'd); *Ruiz v. State*, 358 S.W.3d 676, 680 (Tex. App.—Corpus Christi 2011, no pet.); *Brooks v. State*, 357 S.W.3d 777, 781 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *Watkins v. State*, 333 S.W.3d 771, 778 (Tex. App.—Waco 2010, pet. ref'd). Under this standard, we eliminate the jailhouse-witness and accomplice-witness testimony and examine the remainder of the record to determine if there is any evidence that tends to connect the accused with the commission of the offense. *See Schnidt*, 357 S.W.3d at 851; *Ruiz*, 358 S.W.3d at 680; *see also Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011)). There is "sufficient corroboration if [the remaining evidence] shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense." *Smith*, 332 S.W.3d at 442. Corroboration evidence may be direct or circumstantial. *Id.*

"'Tendency to connect,' rather than rational sufficiency, is the standard: the corroborating evidence need not be sufficient by itself to establish guilt." *Schnidt*, 357 S.W.3d at 851 (citing *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999)); *see Yates v. State*, 505 S.W.3d 631, 643 (Tex. App.—Texarkana 2016, pet. ref'd); *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988) ("It is not necessary that the corroboration directly link the accused

---

[5]The trial court provided the required jury instructions pertaining to inmate testimony in its jury charge.

to the crime or be sufficient in itself to establish guilt.").  Because the jailhouse-witness rule and "[t]he accomplice-witness rule [are] not based on federal or state constitutional notions of sufficiency[,] there simply needs to be 'other' evidence tending to connect the defendant to the offense."  *Id.* (citing *Cathey*, 992 S.W.2d at 462–63).  "Accordingly, a review under the accomplice-witness standard differs from a review of the evidence for legal sufficiency."  *Id.* "Insignificant circumstances sometimes afford most satisfactory evidence of guilt and corroboration of [jailhouse-informant] witness testimony."  *Reed*, 744 S.W.2d at 126.

"To determine the sufficiency of corroboration, we must view the corroborating evidence in the light most favorable to the jury's verdict."  *Jackson v. State*, 320 S.W.3d 873, 881 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994)).  Therefore, "when there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the fact-finder's resolution of the evidence."  *Smith*, 332 S.W.3d at 442 (citing *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009)).  We do not independently construe the corroborating evidence; rather, we consider the combined force of all the corroborating evidence that tends to connect the accused with the offense.  *Cox v. State*, 830 S.W.2d 609, 611–12 (Tex. Crim. App. 1992); *Reed*, 744 S.W.2d at 126.

"[P]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction."  *Smith*,

14

332 S.W.3d at 443 (quoting *Richardson v. State*, 879 S.W.2d 874, 880 (Tex. Crim. App. 1993) (quoting *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984))).

At the Article 38.075 hearing, the State said it intended to offer Alexander's testimony that Williams "told him while he was incarcerated that he wanted a tow truck that Mr. Donald Clark had or that was out there at the residence, and that to obtain that tow truck, he brought a woman to him to take advantage of that situation" and that Williams admitted to taking items from Clark's home. The State argued that the testimony was corroborated by the photograph of the gin pole truck in evidence, the DNA report placing Williams and Jackson at the scene, and the wallet found strewn about the side of the road.

Excluding Alexander's testimony, we find ample evidence tending to connect Williams to the offense. Alan provided a description of the car in Clark's driveway on the day of Clark's murder. Jackson testified that she had gone to Clark's home in Williams's mother's car, which matched Alan's description of the suspect vehicle. The cigarette butt showed that Williams was at Clark's home with Jackson even though Williams denied knowing Jackson or being around Clark's home. Jackson testified that Williams had seen Clark's wallet, which contained cash, and that Williams asked Jackson if she had a toy gun and a mask, a question which Jackson interpreted as a "conversation . . . about robbing Mr. Clark." Jackson was so concerned by Williams's comment that she asked to be let out of his vehicle. According to Alan's testimony that Clark was wearing the same clothes as when he last saw him alive and had his dinner tray out, the incident occurred on the same evening that Jackson visited Clark with Williams. We conclude that this evidence tended to connect Williams to the commission of the offense.

15

Because there was sufficient evidence tending to connect Williams to the offense, we find that Alexander's testimony was sufficiently corroborated. We overrule this point of error.

*(3)*     *There Was No Abuse of Discretion in the Trial Court's Evidentiary Rulings that Are Preserved for Our Review*

In two points of error, Williams attacks two evidentiary rulings allowing admission of an audio recording and of information concerning the vehicle.

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)). "Abuse of discretion occurs only if the decision is so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g))). "We may not substitute our own decision for that of the trial court." *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). "We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case." *Id.* (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

*(a)*     *The Audio Recording*

Helton testified that he received a tip after the murder. Outside of the jury's presence, the State informed the trial court that it intended to offer Exhibit 12, an audio recording of a conversation between Helton and Arthur Waters, whereby, Waters offered a tip that Jackson might be a person of interest. The State indicated that the conversation did not implicate Williams and was being offered, not for the truth of the matter asserted, but for the purpose of

16

showing why Jackson became a person of interest in the investigation. Williams objected on the ground that the conversation constituted hearsay. He continued, "If it's not offered for the truth of the matter, we think that they can get to where they're trying to go without offering the telephone call." Williams also stated that the conversation was "prejudicial and not probative," but did not explain the basis of that objection.

The trial court overruled Williams's objections and granted a running objection to the contents of the telephone conversation. The trial court also instructed the jury that it was to consider the telephone call "for the limited purpose of why the investigation proceeded in the direction that it did," and not "for the truth of the matter contained within the recording." On the call, Waters said that he was hanging out under the tree when he heard Jackson say that she was at Clark's house with a guy on the day of the murder. Waters told Helton that Jackson likely had information to provide.

On appeal, Williams raises a Confrontation Clause issue, which we overrule because the record shows that it was not preserved. *See* TEX. R. APP. P. 33.1; *Smith v. State*, 494 S.W.3d 243, 255 (Tex. App.—Texarkana 2015, no pet.) (finding that a Confrontation Clause issue must be preserved and that "a hearsay objection does not preserve error on Confrontation Clause grounds"). Williams also argues that the trial court should have sustained his hearsay objection and that the probative value of the evidence was substantially outweighed by its prejudicial effect.

"Hearsay is a statement . . . other than one made by the declarant while testifying at the trial, which is offered to prove the truth of the matter asserted." *Richter v. State*, 482 S.W.3d

17

288, 299–300 (Tex. App.—Texarkana 2015, no pet.) (quoting *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995) (citing TEX. R. EVID. 801(d))). "An extrajudicial statement or writing which is offered for the purpose of showing *what* was said rather than for the *truth* of the matter stated therein does not constitute hearsay." *Id.* (quoting *Dinkins*, 894 S.W.2d at 347). "Thus, statements offered to explain how [someone] came to be a suspect of a crime are not hearsay." *Id.* (citing *Dinkins*, 894 S.W.2d at 347). The State offered Waters's statement not for the truth that Jackson was involved in the crime, but for the purpose of showing how the investigation turned in her direction. As a result, we find no abuse of discretion in the trial court's decision to overrule Williams's hearsay objection.

We also overrule Williams's Rule 403 complaint that the statement's probative value was substantially outweighed by the danger of unfair prejudice. Williams's conclusory objection did not explain why he believed the telephone call to be unfairly prejudicial. His name was never mentioned during the call, and it was introduced only to show how the investigation turned to Jackson. Because Williams was not prejudiced by the statements Waters made in the call, we find no abuse of discretion in the trial court's decision to overrule Williams's Rule 403 objection.

Moreover, we "must deem the error harmless if, after reviewing the entire record, [we are] reasonably assured [any] error did not influence the jury's verdict or had but a slight effect." *Josey v. State*, 97 S.W.3d 687, 698 (Tex. App.—Texarkana 2003, no pet.) (citing TEX. R. APP. P. 44.2(b)). "If the same or similar evidence is admitted without objection at another point during the trial, improper admission of the evidence will not constitute reversible error." *Id.* Here, Reynolds testified that Helton told him that he received a tip that Jackson might have some

18

information related to the murder.  Because the same or substantially similar information that was contained in Waters's tip was admitted without objection during trial, Williams's name was not mentioned in the call, and the trial court instructed the jury to consider the call for the limited purpose of why the investigation proceeded in the manner it did, not for the truth of the matter asserted, Williams suffered no harm from any potential error.

*(b)      The Vehicle Report*

Williams additionally complains of the following portions of Reynolds's testimony:

> Q.      (BY [THE STATE]) Be safe to say Mr. Williams, he emphatically denies being out on that property ever and knowing Mr. Clark; is that right?
>
> A.      Initially, he did.
>
> Q.      And you asked him a couple of times about his vehicle.  Tell the jury about the report of the vehicle being out there.
>
> [BY THE DEFENSE]:  Your Honor, I need to object to this as hearsay.
>
> [BY THE STATE]:  It's not being offered for the truth of the matter asserted.  It's offered to explain why he questioned the defendant about this vehicle being seen on the property.
>
> THE COURT:  I'll overrule the objection.
>
> [BY THE DEFENSE]:  Can you instruct them, Your Honor, as to the limited nature of the testimony?
>
> THE COURT:  Yes.  The jury will so be instructed that the evidence is offered only to show why he questioned him about the vehicle being out there.
>
> Q.      (BY [THE STATE]) Tell the jury, why are you -- what information did you receive about a vehicle being out there . . .
>
> A.      . . . When we were running down the what ifs and whys and, you know, anything [Alan] could think of, that as he was leaving . . . he saw an older model sedan that he described, you know, square-body style, you know, nothing

that would have been remotely a late model vehicle, coming into the property. And then we had received information throughout our canvas and questioning of people that if you know anybody, seen anything, that a neighbor nearby had also witnessed seeing a late-model sedan that he thought was a sky blue, light blue color, exiting the property on 2012 after dark. During the time that we began to focus our investigation on Mr. Williams, we learned that they had an early '80s Ford LTD that was registered to his mother that was a baby blue, sky blue color.

On appeal, Williams argues that Reynolds's testimony was hearsay because it related Alan's description of the vehicle, which Reynolds slightly contradicted.[6] The State argues that Williams forfeited this issue. We agree.

A party forfeits any error regarding the erroneous admission of evidence if the same or substantially similar evidence has been previously admitted in the proceeding without objection. *Webb v. State*, 557 S.W.3d 690, 698 (Tex. App.—Texarkana 2018, pet. ref'd) (citing *Conrad v. State*, 10 S.W.3d 43, 46 (Tex. App.—Texarkana 1999, pet. ref'd)). Williams objected to the State's request of Reynolds to tell "the jury about the report of the vehicle being out there." By the time Reynolds testified, Alan had already provided his description of the suspect vehicle and had told the jury that he had seen it on Clark's property as he was leaving on the day of the murder. Therefore, Williams's last issue was not preserved for our review, and we overrule this point of error.[7]

---

[6]At trial, Williams did not argue that Reynolds's description of the vehicle also referenced a description given by a neighbor.

[7]Although Williams now argues that Reynolds's description of the vehicle was slightly different, the record shows that Williams did not raise that issue below by objecting to Reynolds's description of the vehicle. A "complaint raised on appeal must be the same as that urged at trial. Otherwise, the appellant has not preserved the matter for appellate review." *Smith v. State*, 459 S.W.3d 707, 712 (Tex. App.—Texarkana 2015, pet. ref'd) (citing TEX. R. APP. P. 33.1(a); *Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999) (nothing preserved for review if issue on appeal does not comport with objection at trial)). Moreover, the record also shows that Rhoades later testified, without objection, to being on the lookout for a "late-model Ford sedan, light blue-gray in color . . . having a box shape."

We affirm the trial court's judgment.

                                                       Josh R. Morriss, III
                                                       Chief Justice

Date Submitted:      October 26, 2020
Date Decided:        November 25, 2020

Do Not Publish